## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JENNIFER HANSEN,

       Plaintiff,

v.                                    CASE NO. 3:03-CV-586-J-99MCR

BLUE CROSS AND BLUE SHIELD
ASSOCIATION and NATIONAL LONG TERM
DISABILITY PROGRAM,

       Defendants.

_____/

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Dkt. 15) and Memorandum of Law in Support (Dkt. 17), to which Plaintiff filed a Memorandum in Opposition (Dkt. 23). Plaintiff filed a Motion for Summary Judgment (Dkt. 20) and attached Defendants' Responses to Plaintiff's Amended Interrogatories as support, to which Defendants filed a Response (Dkt. 24). Defendants also filed exhibits and the Administrative Record ("AR") (Dkts. 18,19).

### I.    Procedural Posture

Plaintiff filed her Complaint (Dkt. 1) pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.,* on July 18, 2003. Plaintiff is seeking Long Term Disability ("LTD") benefits under the Non-Contributory National Long Term Disability Program (the "Program"), which is administered by the National Employee Benefits Committee, a standing committee of the Board of Directors of Defendant Blue Cross and Blue Shield Association (the "Association")(Dkt. 17). Plaintiff now moves for Summary Judgment arguing she is entitled to LTD benefits due and owing under the Plan, as well as interest, costs, and attorney fees.

Defendants also move for Summary Judgment arguing they properly denied Plaintiff's disability claim after determining that she was not disabled under the terms of the Program. Defendants further contend there is no evidence to support Plaintiff being disabled as of September 1, 2001 and that the denial of benefits was proper.[1] Defendants therefore urge this Court to enter judgment in their favor as a matter of law.

## II.    Background

Plaintiff was a telemarketing sales representative with Blue Cross and Blue Shield of Florida, Inc. ("BCBSFL"), when on April 16, 2001, Plaintiff underwent lumbar fusion surgery in an attempt to relieve her back pain (AR 000027). Plaintiff subsequently applied for short term disability ("STD") benefits and her application contained a notation from her orthopedic surgeon, Dr. Glenn Rechtine, that Plaintiff became medically unable to work on April 16, 2001 and was expected to return to work on July 16, 2001. Id. Plaintiff was initially granted STD benefits from April 16, 2001 through June 4, 2001 and this was extended through August 7, 2001 (AR 000018, 000032 000145). On September 18, 2001 Plaintiff was notified her STD benefits would not extend beyond August 7, 2001 due to an insufficiency of medical evidence to support disability (AR 000156-159). On October 1, 2001, Plaintiff returned to work for three hours. Plaintiff worked for eight hours on October 2, 2001 and one hour and twenty-five minutes on October 4, 2001 (AR 000284). After partially working these three days, Plaintiff did not return to work. BCBSFL allegedly did not receive an explanation from Plaintiff and she continued to be absent from work. Consequently, on October 20, 2001 BCBSFL terminated Plaintiff's employment (AR 000479,

---

[1] Under the Program documents, Plaintiff became eligible for LTD benefits on September 1, 2001 (Dkt. 17, p.7).

000775).

On March 20, 2002 Plaintiff submitted her application for LTD benefits indicating she was still unable to work as her "[b]ack pain. . .makes sitting extremely painful" (AR 000290). Plaintiff also stated her condition progressively deteriorated since beginning in 1990. Id. Plaintiff's application notes she is dependent on others for shaving, light meal preparation and light house cleaning as well as other home maintenance responsibilities (AR 000292). Plaintiff contends on a daily basis, she only drives her car up to thirty minutes and is only outside of her home up to an hour. Id. Plaintiff's application further provides "[t]he majority of the day I spend taking care of my back: icing, using [the] heating pad, elevating my legs, taking medication, going to doctor appointments, showering and doing my doctor recommended stretching" (AR 000293). Plaintiff's application listed her medications and her five treating physicians as follows: Dr. Glenn Rechtine (orthopedics), Dr. William Hunt (her psychiatrist), Dr. Roger Miller (her primary care physician), Dr. Lauren Lucas (her psychologist), and Dr. Gerardo Florez (a pain specialist) (AR 000293-94). Defendants assert medical records were obtained and examined from each of these physicians and when Plaintiff was referred to other physicians, those records were obtained and reviewed as well.

Plaintiff's lumbar fusion surgery was performed by Dr. Rechtine on April 16, 2001 with no medical complications or problems. On May 15, 2001 Dr. Rechtine saw Plaintiff and found her condition "has improved since surgery" and that "[s]he reports she is having less pain than prior to surgery and can walk farther than she could prior to surgery. She can also sit for any length of time" (AR 000007). Dr. Rechtine prescribed OxyContin and stated "[t]he patient can return to activity as tolerated" (AR 000009). On May 25, 2001 Dr. Rechtine noted temporary restrictions would exist for Plaintiff for an estimated three months (AR 000013). Dr. Rechtine saw Plaintiff on July 3, 2001

noting the pain is significantly less than pre-operatively, but on July 12, 2001 Dr. Rechtine stated

Plaintiff's return to work date was unknown (AR 000078-79).[2] On August 7, 2001 Plaintiff was

evaluated by Dr. Christopher Roberts, a pain management specialist. Dr. Roberts' impression was

chronic low back pain and chronic neck pain and he did note that "her continued back pain in the

face of the fusion is difficult to correlate" (AR 000143).

Defendants reviewed records obtained from Dr. Roger Miller, Plaintiff's primary care

physician (AR 000251-253). Dr. Miller discussed Plaintiff's condition with Dr. Rechtine on August

14, 2001 (AR 000251). Dr. Rechtine stated to Dr. Miller that Plaintiff's situation is complicated by

the fact Plaintiff was already on long time narcotics prior to surgery and this has made it difficult

for her to stop taking such medication. Id. Dr. Miller did not indicate whether Plaintiff was disabled,

although he did note a need to continue supervising Plaintiff's use of OxyContin. Id.

Plaintiff had a follow-up appointment with Dr. Rechtine on August 14, 2001 and he stated

"[t]he patient is unable to return to her regular employment" (AR 000046). On September 28, 2001

Dr. Rechtine released Plaintiff to part-time work in a light duty position with a restriction of no

prolonged sitting (AR 000040, 000204-207). Because Plaintiff had an appeal for STD benefits at

this time, Dr. Rechtine was asked by Defendants for clarification as to his September 28, 2001

release (AR 000153). Specifically, in a letter dated October 23, 2001, Dr. Rechtine was asked to

address how many hours Plaintiff could work, how long the restrictions from September 28, 2001

would be in place as well as defining his reference to "prolonged sitting" (AR 000153). Dr. Rechtine

---

[2] Moreover, from July 20, 2001 through September 5, 2001 Plaintiff was treated by a chiropractor, Cynthia Bohannon, D.C., as Plaintiff continued to request therapy for low back pain (AR 000239-247).

did not respond to Defendants' request.[3] On December 4, 2001 Dr. Rechtine again indicated on a return to work form that Plaintiff could only do light work and she was "unable to do regular employment because of [an] inability to sit for extended periods of time" (AR 000167). Dr. Rechtine also noted Plaintiff had tried to return to work, but was unable to sit long enough to be productive (AR 000210).

On February 11, 2002, Defendants received an Attending/Consulting Physician's Statement that was completed by Dr. Rechtine on January 2, 2002 (AR 000964-965). Dr. Rechtine found Plaintiff could sit, climb, squat, twist, perform keying and data entry as well as lifting between five and twenty pounds for one to three hours. Dr. Rechtine also noted Plaintiff could stand, bend, walk and kneel for four to six hours and that she could drive, pay bills, prepare meals, shop, attend social obligations, bathe, self dress, remember instructions and do light house cleaning and laundry (AR 000965). Dr. Rechtine concluded that Plaintiff could only work part-time and that she could sit no longer than fifteen minute intervals. Id.

Defendants again attempted to receive clarification from Dr. Rechtine concerning Plaintiff's ability to work full time, yet Dr. Rechtine failed to respond (AR 000090, 000232). Instead, Defendants assert the only response received was an April 8, 2002 telephone call when an individual in Dr. Rechtine's office stated Plaintiff had not been seen by the doctor since her last visit on

---

[3] On November 19, 2001 Plaintiff was evaluated by Dr. Michael Robinson, a professor at the University of Florida Department of Clinical Health and Psychology, and Dr. Emily Wise, a post doctoral fellow (AR 000422). Dr. Rechtine had referred Plaintiff to assess the applicability of psychologically based treatments for her pain management. Id. Drs. Robinson and Wise found that Plaintiff "often does not use the coping strategies commonly used by other chronic pain patients. . . ." Id. However, the "results indicate that Ms. Hansen [Plaintiff] experiences significant life disruption associated with her chronic pain" and therefore the Drs. recommended Plaintiff participate in a psychologically based pain management program. (AR 000422-423). In a January 31, 2001 telephone conversation follow up, Drs. Wise and Waxenberg found Plaintiff had only attended three of ten pain management group sessions, although Plaintiff stated she had benefitted from the sessions (AR 000424).

December 4, 2001. Moreover, that Plaintiff had cancelled her December 11, 2001, February 26, 2002, March 29, 2002 and April 16, 2002 appointments (000472-473). During an April 10, 2002 phone call with a nurse in Dr. Rechtine's office, the nurse was asked whether Plaintiff could have returned to work as of September 1, 2001 (AR 000473). The nurse stated Dr. Rechtine would need to see Plaintiff again to answer that question as her file did not contain any new information.

On March 8, 2002 Plaintiff was seen by Dr. Gerardo Florez, an anesthesiologist and pain management specialist. Dr. Florez found Plaintiff's lumbar spine mobility to be limited to "70 percent in forward flexion and backward extension. . .and 50 percent limited in lateral flexion," and his diagnostic impression was "[l]umbar back failed surgery syndrome" (AR 000855). Dr. Florez recommended the implantation of a trial spinal cord stimulator which occurred on June 4, 2002. The stimulator was removed on June 7, 2002 and Dr. Florez recommended implanting a permanent spinal cord stimulator, although apparently this did not occur (AR 000589, 000668). Plaintiff continued to receive treatment from Dr. Florez until September 4, 2002 (AR 000658-676).

On March 20, 2002 treating psychiatrist Dr. William Hunt III prepared an Attending Psychiatric Statement for the claims administrator stating he had seen Plaintiff from February 24, 2000 through January 9, 2002 (AR 000444). Dr. Hunt noted Plaintiff was currently not able to perform full time or part-time work, however, Dr. Hunt wrote "patient's now chronic pain syndrome, w[ith] less than ideal results w[ith] surgery [being] the disabling factor; return to work [and] restrictions need to be deferred by me to the non-psychiatrist. . . ." (AR 000447). A nurse case manager spoke with Dr. Hunt on April 9, 2002 concerning Plaintiff's condition (AR 000477). Dr. Hunt stated Plaintiff had demonstrated different levels of pain behavior consistent to her descriptions. Id.  Dr. Hunt also stated he did not believe Plaintiff's pain to be caused by a

6

psychogenic component. Id. Moreover, on May 6, 2002 the nurse case manager again spoke with Dr. Hunt who emphasized Plaintiff's pain complaints are not "primarily psychological in origin" (AR 000478).

The claims administrator also reviewed records obtained from Dr. Lauren Lucas, the psychologist and pain specialist to whom Dr. Hunt had referred Plaintiff. Dr. Lucas met with Plaintiff once a month from July 2001 through October 2001 and again in January and March 2002 (AR 000427-000432). On April 5, 2002 a nurse case manager sent Dr. Lucas a request for additional information on Plaintiff (AR 000425). Specifically, the letter addressed whether Dr. Lucas believed Plaintiff was capable of performing the duties of a comparable salary sedentary job as of September 1, 2001. Id. Dr. Lucas answered Plaintiff was not able to perform such duties as Plaintiff has worse pain when she is sitting and she has reported "remaining in bed most of [the] day" Id. For further clarification, the nurse case manager again wrote to Dr. Lucas on May 1, 2002 asking if any psychological symptom or condition existed that would prevent Plaintiff from returning to work (AR 000426). Dr. Lucas responded Plaintiff's pain disorder contained psychological factors and general medical conditions, although Dr. Lucas did not address whether Plaintiff could return to work.[4] Id.

Lastly, on April 5, 2002 a nurse case manager spoke with Plaintiff who asserted she is unable to return to work due to pain. Plaintiff contended she attempted to work in October 2001, although "the pain was so bad" she could not continue (AR 000457).

Thereafter, the nurse case managers forwarded all of Plaintiff's medical records to Dr. E.

---

[4] The claims administrator also obtained and reviewed records from Dr. Orlando Florete, a pain specialist and surgeon who treated Plaintiff for complaints associated with back pain and carpal tunnel syndrome from April 2000 through March 2001. On May 25, 2000, Dr. Florete urged Plaintiff not to take STD benefits, instead offering alternative long acting pain medications (AR 000099).

Richard Blonsky, the disability Program's Medical Director, for his review.[5] Initially, Dr. Blonsky decided not to make any determination as to whether Plaintiff was disabled until he received clarification from Plaintiff and Drs. Miller and Rechtine concerning Plaintiff's current status as compared to her pre-operative condition (AR 000454). While additional requests for information were sent to Plaintiff and Drs. Miller and Rechtine, no responses were given (AR 000217, 000231-232). Thereafter, on May 14, 2002 Dr. Blonsky again reviewed Plaintiff's file and found that "[t]he claimant, her doctors and her attorney have not provided any additional medical information to justify a determination of total disability as of 9/1/01" (AR 000453). Dr. Blonsky recognized her pathology and surgery, but did not find that to equate to disability. Id. His report therefore found Plaintiff was not disabled. Id.

Additionally, Defendants hired Medical Management and Re-Employment, Inc. to conduct a Transferable Skills Analysis/Wage Earning Capacity Report ("TSA Report") to determine whether employment opportunities existed in the Jacksonville area that were commensurate with Plaintiff's abilities and had salaries comparable to the wages earned while she was employed at BCBSFL (AR 000624-000627). Moreover, any available positions had to comply with Dr. Rechtine's restrictions, including not sitting for longer than fifteen minutes (AR 000624). The TSA report found six available positions consistent with Plaintiff's ability and with a comparable salary that complied with Dr. Rechtine's restrictions (AR 000625-627).[6]

---

[5] Dr. Blonsky is also the Medical Director of the Pain and Rehabilitation Clinic of Chicago and an Associate Professor of Medicine at Northwestern University Medical School.

[6] The deadline to inform Plaintiff as to the determination of her eligibility for LTD benefits was May 17, 2002. However, because the claims administrator had not received the TSA report as of May 17, 2002, a letter was sent to Plaintiff advising her a thirty day extension was necessary and a decision would be made no later than June 16, 2002 (AR 000808).

On June 3, 2002 the Medical Review Committee informed Plaintiff that her claim for LTD benefits was denied (AR 000633-638). The letter outlined Plaintiff's claim, the evidence considered, the gaps in the evidence as well as a discussion and summary describing why the medical evidence was insufficient to demonstrate disability as of September 1, 2001 (AR 000634-635). The letter also explains the appeal procedure, how Plaintiff can perfect her claim, what she can expect after filing an appeal and notifying her that the appeal deadline is December 3, 2002 (AR 000636-637).

On June 19, 2002 Defendants received Plaintiff's notice of appeal and request for documentation (AR 000639-640). On July 16, 2002 Defendants sent an acknowledgment that Plaintiff's appeal had been received and providing the requested documentation (AR 000657). The acknowledgment letter also stated that no medical evidence had been included in Plaintiff's notice of appeal and that evidence could be submitted up through December 3, 2002. Id. Plaintiff's counsel subsequently requested additional time to submit evidence on behalf of Plaintiff and on December 30, 2002, Plaintiff's counsel was notified the deadline to submit evidence would be extended until March 30, 2003 (AR 000678).

Defendants state that in support of her appeal, Plaintiff only submitted one set of medical records from Dr. Florez for treatment beginning on April 3, 2002 (AR 000312-000333, 000667-000676). Dr. Florez's records did not consist of any additional clinical evaluations or assessments of Plaintiff's alleged disability.[7] Id. Nevertheless, the claims administrator decided to have Plaintiff undergo an independent medical examination ("IME"). Dr. James Atchison, the Medical Director of Shands Rehabilitation Hospital at the University of Florida's Division of Physical Medicine and

---

[7] It appears that a portion of the medical records submitted on appeal had previously been examined by Defendants. See (AR 000658-666 and 000322-330).

Rehabilitation, was commissioned to do the IME (AR 000597-000602, 000605, 000684). Dr. Atchison reviewed Plaintiff's medical records and performed the IME on May 5, 2003 (AR 000597). After conducting the examination, Dr. Atchison's impression was Plaintiff had persistent and chronic low back pain, chronic headache and depression with the possibility of a coexistent anxiety disorder (AR 000601). Dr. Atchison's opinion was that Plaintiff "would be physically capable of work related activity on an eight hour basis if there were modifications for her. She would need to be able to change positions from sitting at least every 30 minutes and do short bits of walking" (AR 000601-602). Moreover, Dr. Atchison also provided bending and lifting limitations and noted there might be a psychological component related to Plaintiff's pain and that she could potentially benefit from specific pharmacologic treatment (AR 000601).

On June 2, 2003, Barbara Grant contacted Dr. Florez and asked if he would review and comment on Dr. Atchison's report (AR 000001).[8] However, Dr. Florez refused to comment on Plaintiff's condition because he had not recently seen her. Id. Ms. Grant proceeded to review the entire claims file and specifically referenced Dr. Atchison's IME finding and the TSA report and determined there was no objective evidence of a total disability. Id. Consequently, in a letter dated June 12, 2003 the National Employee Benefits Committee, through Ms. Grant, rejected Plaintiff's appeal for LTD benefits. The denial letter outlines the evidence reviewed on appeal and discusses the reasons for denying the claim (AR 000586-000589). Specifically, Plaintiff failed to provide any information on appeal establishing her disability and the IME concluded she could work with certain restrictions (AR 000589). It was therefore determined the evidence did not support Plaintiff being

_____

[8] Barbara Grant is Assistant Secretary of the National Employee Benefits Committee (AR 000690).

disabled as of September 1, 2001.

## III.   Standard of Review

The Court should grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987); Edwards v. Acadia Realty Trust, Inc., 141 F. Supp. 2d 1340, 1344-45 (M.D. Fla. 2001). The Court will construe the record and all inferences that can be drawn from it in the light most favorable to the nonmoving party, and the moving party bears the initial burden of establishing the absence of a genuine material fact. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Samples on Behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). Once this burden is met, however, the opposing party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 342. The Eleventh Circuit explained in Samples that the opposing party need only present evidence from which a jury might return a verdict in its favor in order to survive the moving party's motion for summary judgment. See Samples, 846 F.2d at 1330; see also Augusta Iron & Steel Works v. Employers Insurance of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

Notably, the Supreme Court pointed out in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), that the moving party's burden only extends to facts that might affect the outcome of the lawsuit under the governing law, as "[f]actual disputes that are irrelevant or unnecessary will not be counted." Summary judgment will only be granted if all facts and inferences point

11

overwhelmingly in favor of the moving party, such that a responsible jury could not find in favor

of the opposing party.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  If

there is conflicting evidence that will permit differing reasonable inferences, the case will be

submitted to the jury.  See Augusta Iron & Steel, 835 F.2d at 856.

## IV.    Standard of Review for ERISA Claims

The Eleventh Circuit "'adopted the following standards for reviewing administrators' plan

interpretations: (1) de novo where the plan does not grant the administrator discretion[;] (2) arbitrary

and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and

capricious where there is a conflict of interest.'" HCA Health Services of GA., Inc. v. Employers

Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001)(quoting Buckley v. Metropolitan Life, 115 F.3d

936, 939 (11th Cir. 1997)).

In reviewing a claims administrator's determination, the court must proceed through a series

of steps.  HCA Health Services of GA., Inc., 240 F.3d at 993. The court first must apply the de

novo standard to "determine whether the claim administrator's benefits denial decision is

'wrong'(i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry

and affirm the decision." Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138

(11th Cir. 2004) (citing HCA Health Services of GA., Inc., 240 F.3d at 993 n.23). If the court finds

the administrator's decision is de novo wrong, the court must determine whether the administrator

is granted discretion in  reviewing claims. If the court determines the administrator is not granted

discretion, the court must "end judicial inquiry and reverse the decision." Id. If the administrator's

decision was de novo wrong and discretion was given, the court must "then determine whether

'reasonable' grounds supported" the decision. Id. (internal citations omitted). If the court does not

find reasonable grounds exist, the court must reverse the administrator's decision. Id. However, if reasonable grounds do exist, the court must determine if the administrator operated under a conflict of interest. If no conflict of interest is present, the court may affirm the administrator's decision. Conversely, if a conflict of interest does exist, the court will apply heightened arbitrary and capricious review to the administrator's decision to affirm or deny it.[9] Id.

Plaintiff contends the heightened arbitrary and capricious standard is applicable and Defendants argue for a review under the arbitrary and capricious standard. Consequently, the parties do not dispute that discretion was given in reviewing claims.

The Program at issue involves the Blue Cross and Blue Shield Association (the "Association"), an Illinois not-for-profit corporation. The Association licenses the use of the Blue Cross and Blue Shield service marks and provides other services to separate Blue Cross and Blue Shield organizations across the United States (Dkt. 19 ¶ 3). BCBSFL, where Plaintiff was previously employed, is one of the Association's licensees and is a participant in the disability Program. The Program contains three primary documents: the National Long Term Disability Trust Agreement, the Non-Contributory National Long Term Disability Program, and the National Long Term Disability Program Association Agreement Blue Cross and Blue Shield Association and Participating Plan, and the amendments thereto (Dkt. 19 ¶ 5). The National Long Term Disability Program Association Agreement Blue Cross and Blue Shield Association and Participating Plan identifies the Program administrator as the National Employee Benefits Committee ("NEBC"), a

---

[9] The court in HCA Health Services of GA., Inc., 240 F.3d at 993 further stated "[t]he arbitrary and capricious deference is diminished, though, if the claims administrator was acting under a conflict of interest. If the claims administrator was acting under a conflict of interest, 'the burden shifts to the [administrator] to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self interest.'" (quoting Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1566 (11th Cir. 1990))(internal citations omitted).

standing committee of the Board of Directors of the Association. However, the NEBC has delegated day-to-day operation of the Program to the National Employee Benefits Administration ("NEBA"), a department of the Association. NEBA, through its Medical Review Committee, reviewed Plaintiff's claim and the Assistant Secretary of the National Employee Benefits Committee, reviewed her appeal.

Because BCBSFL participates in the disability Program, Plaintiff is eligible to apply for LTD benefits (Dkt. 19, ¶ 6). As a condition of participating in the Program, employers are required to contribute to the Program's Trust. These contributions are used as funding for administrative expenses and for benefits paid by the Program (Dkt. 19 ¶ 7). The employer contributions and the investment generated by the Trust comprise the only sources of the Program's funding. Id.

Plaintiff contends that because the NEBC denied her claim and given that the Association contributes to the Program's Trust, a conflict of interest exists triggering the application of heightened arbitrary and capricious review. Defendants argue that although the Association is a participating employer and contributes to the Program's Trust for the purpose of covering the Association's employees, a conflict of interest does not exist. Defendants further assert the Association is one of the smallest contributors to the Program's Trust. Specifically, "the Association accounts for less than 2 percent of the Program, whether measured by active participants, benefit payments, funding contributions, allocated assets, or liabilities." (Dkt. 24, Exhibit A, ¶ 5). Defendants contend the contributions from each participating employer are based on an experience rating component that requires the particular employer involved to bear approximately ninety-five percent of the claim. Id. Having to pay claim benefits to one participating employer's employees "does not materially affect the contribution levels of other participating employers." (Dkt. 24,

14

Exhibit A, ¶ 6).[10]

## V.    Discussion

Regardless of the standard of review to be applied, the Court must begin with a *de novo* review of the administrative record to determine if Defendants' interpretation of the Program and subsequent denial of Plaintiff's LTD benefits was wrong. In thoroughly reviewing the entire record, and despite Plaintiff's unfortunate discomfort, this Court cannot hold that Defendants' decision to deny Plaintiff LTD benefits was wrong.

Section 1(p) of the Non-Contributory National Long Term Disability Program provides disabled means "that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred" (Exhibit 2, p.4; Dkt. 19, ¶ 11). This definition was modified by a clarifying amendment effective January 1, 1995 providing "[a]n occupation is considered comparable to that in which the Participant was engaged for the Employer if the earnings potential of the occupation is comparable to the employee's salary range at the time he became Disabled" (AR 000499; Dkt. 19,  ¶ 12). The definition of disabled in Section 1(p) was further clarified by amendment, effective March 11, 1998, "with respect to all Participants in the Program," to provide "[t]he determination as to whether a Participant is 'Disabled' shall be based on medical evidence satisfactory to the Committee in its sole discretion" (Dkt. 19, ¶ 13).

The Court agrees with the claims administrator's decision and does not find the medical

_____

[10] Moreover, "[t]he Association's responsibility for the actual payment of benefits is limited to directing the trustee to disburse funds from the trust. The Association has no independent obligation to pay benefits from its own assets" (Dkt. 24, Exhibit A, ¶ 4).

evidence in the record sufficient to support Plaintiff being disabled under the Program. Instead, the record reflects Plaintiff was not disabled and could return to employment, as long as the position complied with certain restrictions. Among these restrictions are Plaintiff be able to change positions from sitting at least every fifteen minutes.[11] Defendants allege BCBSFL offered to accommodate any restrictions placed upon Plaintiff and the TSA report found available employment positions that complied with these restrictions (AR 000624). Consequently, under the language of the Program, the Court does not find the claims administrator's decision to be wrong.

Nevertheless, the Court does want to address certain medical documentation in the record concerning Plaintiff's alleged disability. The Court notes Dr. Rechtine's records from August 14, 2001, where Plaintiff was determined to be  unable to return to her regular employment and from September 28, 2001, where Dr. Rechtine signed a release allowing Plaintiff to return to part-time light duty work, with the restriction of no prolonged sitting (AR 000040, 000046, 000206).[12] Moreover, on January 2, 2002 Dr. Rechtine completed an Attending/Consulting Physician Statement providing Plaintiff could perform part-time work subject to a fifteen minute sitting restriction (AR 000965). When the claims administrator attempted to obtain more information from Dr. Rechtine's office, it was discovered Plaintiff had not been seen by Dr. Rechtine since December 4, 2001 and that she had cancelled appointments with him on December 11, 2001, February 26, 2002, March 29, 2002 and April 16, 2002 (AR 000472-473).

---

[11] The Court does note the IME found Plaintiff needed to change positions from sitting every thirty minutes (AR 000601-602). However, the TSA report found comparable employment positions with Dr. Rechtine's restriction of not sitting for longer than fifteen minutes at a time (AR 000624).

[12] In an attempt to clarify the September 28, 2001 restrictions placed upon Plaintiff, a letter was sent to Dr. Rechtine. However, Dr. Rechtine never responded and on December 4, 2001 he signed another work release for light work and noted Plaintiff's inability to do regular work because she could not sit for extended periods of time (AR 000167).

The record also reveals a note from Dr. Hunt, Plaintiff's psychiatrist, stating he believed Plaintiff was unable to work due to pain, but that he would have to defer to non-psychiatrist working with Plaintiff on this topic (AR 000447). Dr. Lucas, Plaintiff's psychologist and pain specialist, stated Plaintiff could not perform the duties of a comparable position as of September 1, 2001 based on Plaintiff's reports of pain (AR 000425). The claims administrator requested information from Dr. Lucas concerning whether Plaintiff had a psychological or mental/nervous symptom precluding her return to work, and Dr. Lucas wrote psychological factors and medical conditions were associated with Plaintiff's pain (AR 000702). However, Dr. Lucas did not address Plaintiff's ability to return to work.

The claims administrator determined, and this Court agrees, that the above documentation taken in conjunction with the entire record is insufficient to establish a disability under the appropriate definition. Dr. Hunt deferred to Plaintiff's non-psychiatric treating physicians on if she could return to work and Dr. Lucas made general conclusions as to why Plaintiff could not perform the duties of a comparable position. Moreover, Dr. Rechtine's reports reveal a convoluted construction of how much work Plaintiff could perform. Dr. Rechtine's failure to provide any clarification or additional information when asked, combined with Plaintiff's repeated cancellation of her appointments with him, is problematic for this Court and weakens Plaintiff's claim for LTD benefits.

The remainder of the record is replete with evidence supporting the claims administrator's determination to deny Plaintiff's claim. The claims administrator obtained and reviewed medical documentation from all of Plaintiff's treating physicians as well as other physicians to which she was referred. If the claims administrator required clarification about a document or phrase, phone

17

calls were made and letters were written. The claims administrator even once spoke with Plaintiff about her condition. After all the documentation was obtained, the information was sent to Dr. Blonsky to review. Dr. Blonsky requested clarification from Plaintiff and Drs. Miller and Rechtine as to her current status compared with her condition prior to surgery, yet no responses were provided. Thereafter, based upon all of Plaintiff's medical documentation, Dr. Blonsky determined Plaintiff was not disabled (AR 000453). In addition to Dr. Blonsky's review, the TSA report commissioned by the claims administrator found other available employment positions with comparable salaries that complied with Dr. Rechtine's fifteen minute limitation on sitting. In light of all of this evidence, the Court does not find the denial of Plaintiff's LTD benefits to be wrong.

The Court also notes Plaintiff's failure, on appeal,  to submit additional medical documentation to further bolster her claim. Rather, the Court finds on July 19, 2002 the claims administrator informed Plaintiff that she could submit evidence until December 3, 2002. When Plaintiff requested an extension of this deadline, the claims administrator allowed evidence to be submitted through March 20, 2003. Plaintiff was therefore given a window of approximately eight months to further document and support her alleged disability, yet she failed to utilize this opportunity. Plaintiff instead submitted one set of medical records from Dr. Florez. These records contained no evaluation or opinion as to Plaintiff's alleged disability and were therefore not beneficial to Plaintiff's appeal.

Despite the lack of new medical documentation, the claims administrator nevertheless decided to have an IME conducted by Dr. Atchison. All of Plaintiff's medical documentation was

reviewed and after the IME, Dr. Atchison found Plaintiff was not disabled.[13] The claims administrator took Dr. Atchison's report and further asked Dr. Florez to review and comment on the reports conclusions. Although Dr. Florez refused to comment since he had not seen Plaintiff for treatment in a significant amount of time, the claims administrator's attempt to procure additional information underscores the thoroughness of the review. Consequently, with an IME finding Plaintiff not disabled and with virtually no new medical documentation submitted by Plaintiff, her appeal was denied via letter on June 12, 2003.

In all and based upon the above, the Court does not find the claims administrator's decision to deny Plaintiff's LTD claim to be *de novo* wrong. The Court must therefore end the judicial inquiry and affirm the decision. Williams, 373 F.3d at 1138.

Alternatively, if the Court were to apply some form of the arbitrary and capricious standard of review, the Court would still conclude Defendants are entitled to summary judgment. Under the arbitrary and capricious standard of review, if the Court were to find the decision to deny Plaintiff's claim wrong, it nonetheless was still reasonable. See HCA Health Services of GA., Inc., 240 F.3d at 994 (noting the court must "determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable")(internal citations omitted). As was discussed above, the claims administrator's thorough collection and review of medical documentation, combined with the TSA report and Dr. Blonsky's subsequent review and

---

[13] Although Dr. Atchison did place restrictions on her being able to change positions every thirty minutes and in limiting her ability to lift and bend.

19

determination, support a finding that a reasonable determination was made on Plaintiff's claim.[14] Even if the Court disagreed with the claims administrator's determination, it would not find it to be arbitrary and capricious.

Moreover, if heightened arbitrary and capricious review were applied, summary judgment for Defendants remains appropriate. The Court finds that based upon the Program's contribution provisions, BCBSFL would be required to bear at least ninety-five percent of the cost of its own claims expense. As was outlined above, the Association would therefore only be responsible for less than two percent of the five percent of the cost having to be bourne by participating employers other than BCBSFL should Plaintiff be found eligible for benefits. Specifically, the Association's annual cost would be, prior to any offsets such as Social Security, approximately $18.00.[15] Such an insufficient monetary amount is unlikely to create a conflict of interest triggering application of heightened arbitrary and capricious review. Nonetheless, even if a potential conflict of interest exists, the record does not contain any evidence demonstrating the claims administrator's decision was somehow tainted by any self interest. Instead, the record reflects Plaintiff was not disabled pursuant to the terms of the Program and provides the claims administrator extended the period of time in which Plaintiff could submit additional evidence on appeal. In all, the evidence supports a finding the decision was reasonable and not tainted by any conflict of interest. Summary judgment will therefore be entered for the Defendants.

---

[14] The findings of the IME on appeal provide further support Plaintiff was not disabled under the terms of the Program as of September 1, 2001.

[15] This calculation is based upon Plaintiff's last salary for purposes of calculating benefits, $29,400.00, and taking sixty percent of that results in an annual LTD benefit payment of $17,640.00 (Dkt. 24, p.4). BCBSFL would be required to pay at least $16,758.00 and the Association would be responsible for no more than two percent of the $882.00 difference. Thus, the cost annually for the Association would be approximately $18.00.

Accordingly, upon due consideration, it is hereby

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 15) is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment (Dkt. 20) is **DENIED**.

3. The Clerk is directed to enter judgment in favor of the Defendants and close this file.

**DONE AND ORDERED** at Jacksonville, Florida this _23___ day of May, 2005.


JOHN H. MOORE II
United States District Judge

Copies to: Counsel of Record